1
2
3
4
5

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TOM GONZALEZ, as Personal Representative for the Estate of Thomas J. Gonzales, II, | Case No:  C 08-3189 SBA |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| UNITED STATES OF AMERICA, the DEPARTMENT OF TREASURY by its agency, the INTERNAL REVENUE SERVICE, | Dkts. 90, 92 |
| Defendant. | |

        Plaintiff Tom Gonzalez ("Plaintiff"), the personal representative for the estate of

taxpayer Thomas J. Gonzales, II ("Taxpayer"), deceased, brings this suit for a refund of

allegedly illegally-assessed Federal personal income taxes that Plaintiff (Taxpayer's father)

paid in response to Defendant Internal Revenue Service's ("Defendant" or "IRS") Notice of

Deficiency for the tax years ending December 31, 2000 and December 31, 2001.

        The parties are presently before the Court on Defendant's Motion for Summary

Judgment and Plaintiff's Motion for Partial Summary Judgment.  Dkts. 90, 92.  Having read

and considered the papers filed in connection with these matters and being fully informed, the

Court hereby GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's

Motion for Partial Summary Judgment for reasons set forth below.  The Court, in its discretion,

finds these matters suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b).

## I.      FACTUAL BACKGROUND

The principal issue in this case involves the tax consequences of a financial transaction undertaken by Taxpayer, which Plaintiff alleges resulted in a short-term capital loss to Taxpayer in the amount of $142,002,000 for the year 2000.

During the 2000 tax year, Taxpayer sold a large number of shares in his Commerce One stock resulting in a long-term capital gain of $132,521,496.  Dkt. 90-3, Hendon Decl. Exs. 1 (Schedule D, Part II) & 15 (Smith Dep. Tr.) at 39:9-19.  In September or October 2000, Taxpayer and his accountant, Steve Smith, met with John Larson, at Smith's suggestion.  Id., Ex. 15 at 43:3-23.  Larson was a founder of a number of related entities collectively referred to as "Presidio."  Id. at 45:4-46:24.  When Smith and Taxpayer first met with Larson, Larson told them that he did not have anything that would "work" for Taxpayer because it was too late in the year.  Id. at 43:3-18.

Smith then learned of a tax shelter that was being sold by Ernst & Young known as The Personal Income Company or Personal Investment Corporation ("PICO").  Id. at 37:12-39:19; 43:3-23.  PICO was designed primarily to defer the payment of taxes.  Id. at 38:4-22.  Smith recommended Taxpayer to Ernst & Young regarding PICO after Taxpayer was "rebuffed" by Larson.  Id. at 43:3-18.  Taxpayer was interested in participating in PICO because he wanted to see whether it would help out his "tax position."  Id. at 39:15-19. Although Taxpayer was unhappy with some of the restrictions required in order to participate in PICO, he eventually entered into the PICO transaction.  Id. at 39:20-40:24.

After Taxpayer entered into PICO, Smith received a telephone call from Larson, in December 2000, informing him that Larson had a "unique opportunity" for Taxpayer.  Id. at 42:7-18.  The "unique opportunity" was the transaction at issue in this case involving the acquisition of United States Treasury Bonds and the subsequent exchange of the interest in those bonds for preferred shares of stock in a Cayman Islands hedge fund, Bayside Diversification Fund, Ltd. ("Bayside").  Id. at 42:22-45:25.  After Larson's call, Taxpayer ceased any further activity with respect to PICO and entered into the transaction at issue.  Id. at 40:10-24; 54:1-25.

The Court next describes the details of that transaction.

**A.    BOND PURCHASE AGREEMENT**

One of Taxpayer's strategies was a leveraged investment in high-interest U. S. Treasury Bonds that were originally issued in 1985.  Dkt. 92, Plf.'s Mtn. at 2.  On December 8, 2000, investment company Blackvest Finance, LLC ("Blackvest"), an investment company wholly owned by Presidio, purchased from Deutsche Bank Securities, Inc. ("Deutsche Bank") such U.S. Treasury Bonds.  Dkt. 92-2, Lemons Decl. ¶ 5.  The Bonds had a face amount of $233,000,000.  Id.  The Bonds are 30-year U.S. Treasury Bonds, which pay coupon interest semi-annually at an above-market rate of 11.25%.  Id.  Due to the high interest rate, the fair market value of the bonds exceeded their face value.  Id.  Blackvest paid Deutsche Bank $368.5 million for the Bonds.  Hendon Decl. Ex. 5 at TJG000119-122.

Blackvest's purchase of the Bonds was through a buy/sell repurchase transaction, also known as a "buy/sell repo" transaction.  Lemons Decl. ¶ 5.  This is a financial transaction in which securities are purchased subject to the purchaser's agreement, for valuable consideration paid to the seller, to sell them back to the seller at a future date.  Dkt. 92-2, Schainbaum Decl. Ex. 26 (Doree Dep. Tr.) at 41-43; Lemons Decl. ¶ 5.  The repo loan agreement between Blackvest and Deutsche Bank carried an interest rate of 6.5% and matured on January 8, 2001. Hendon Decl. Ex. 6.

Shortly after the Bond sale from Deutsche Bank to Blackvest, Blackvest and Deutsche Bank entered into an "interest swap transaction" with respect to the Bonds.  Lemons Decl. ¶ 5. Pursuant to that transaction, Blackvest exchanged the fixed coupon U.S. Treasury Bond interest payments it received pursuant to its ownership of the Bonds for bi-annual interest payments based on a floating interest rate, which was determined by open market forces.  Id.

On December 8, 2000, Blackvest sold its interest in the Bonds to Taxpayer.  Id. Pursuant to that sale, Taxpayer contributed cash of $9,787,500 and received $233,000,000 in face value of the Bonds, valued at $372,800,000, financed with a nonrecourse "premium Note"

("Note").[1]  Dkt. 92-2, Miller Decl. ¶ 4.  The Note to Blackvest carried principal of $226,883,000 at a fixed interest rate of 11.25% and a "premium" of $136,129,500.  Id. Therefore, the total financing provided by Taxpayer was $363,012,500 (which is equal to the sum of $226,883,000 and $136,129,500).  Id.  In other words, the purchase of $372,800,000 of Bonds was made with $9,787,500 in cash and $363,012,500 in financing.  Id.

The Note was an interest only loan – no principal was to be paid until maturity of the Note on February 15, 2015.  Id. ¶ 5.  The Note contained a prepayment provision that allowed Taxpayer to repay the obligation before the maturity date, at a price determined in accordance with a formula described in the Note, and after paying a breakage fee and accrued interest on the Note.  Hendon Decl. Ex. 7.  The prepayment formula was based on changing market interest rates, and may have been either greater or less than the premium amount.  Miller Decl. ¶ 5.

Moreover, the Note was secured by the Bonds, which were pledged by Taxpayer as collateral, as well as Taxpayer's obligation to maintain a certain minimum value of the collateral.  Hendon Decl. Ex. 8 at TJG000139.

### B.   THE BAYSIDE TRANSACTION

On December 28, 2000, Taxpayer exchanged his interest in the Bonds for shares of preferred stock valued at $3,915,000 in Bayside, and the assumption of the Note by Bayside. Hendon Decl. Ex. 9.  It was this exchange that triggered Taxpayer's claimed tax loss of $142,002,000.  Bayside prepaid the Note and sold its interest in the Bonds back to Blackvest on January 8, 2001.  Id. Ex. 10.  On July 13, 2001, the preferred stock paid a dividend of $169,911

---

[1] Neither party has defined the term "nonrecourse."  Therefore, the Court will apply the usual meaning of that term, i.e., a loan that is secured by a pledge of collateral, but for which the borrower is not personally liable.  See, e.g., In re Dan Hixson Chevrolet Co., 20 B.R. 108, 111 (Bkrtcy. Tex. 1982) ("Nonrecourse simply means that the lienor may look only to the property subject to his lien to satisfy his debt and cannot look to the debtor personally for payment.").

to Taxpayer.  Id. Ex. 12.  On November 28, 2001, Taxpayer sold the preferred stock back to Bayside.  Id. Ex. 13.[2]

### C.    TAXPAYER'S TAX RETURNS AND THE NOTICE OF DEFICIENCY

On or about April 15, 2001, Taxpayer filed a Form 1040 2000 U.S. Individual Income Tax Return, on which he reported a short-term capital loss deduction of $142,002,000 from the sale of "Blackvest Bonds."  Dkt. 92-2, Smith Decl. ¶ 11.  On or about April 15, 2002, Taxpayer filed a Form 1040 2001 U.S. Individual Income Tax Return, on which he reported a net operating loss of $8,609,628.  Id. ¶ 12.

On December 6, 2006, Defendant issued to Plaintiff, as the personal representative for Taxpayer's estate, a Notice of Deficiency asserting an income tax deficiency of $26,231,835 (exclusive of interest) and an accuracy-related penalty under 26 U.S.C. § 6662(a) of $5,246,367 for the tax year 2000.  Id. ¶ 13; First Amended Complaint ("FAC") ¶ 14.  The Notice of Deficiency also claimed a $2,130,142 decrease in Taxpayer's net tax loss for the tax year 2001, arising from disallowed itemized deductions and a disallowed deduction for a refund of State Income Tax.  Smith Decl. ¶¶ 14-15; FAC ¶ 14.  On April 13, 2007, Plaintiff paid $31,478,202 to Defendant under protest for the tax deficiency and related penalty.  FAC ¶ 7.

On August 17, 2007, Plaintiff filed tax refund claims for overpayment of income taxes for tax years 2000 and 2001, which asserted, inter alia, that the capital loss generated by the Bond Purchase Agreement and Bayside Transaction (collectively, "the Transaction") is an allowable deduction.  FAC ¶ 8.  On June 11, 2008, Defendant "partially disallowed" Plaintiff's refund claims.  FAC, Ex. 2.

## II.    **PROCEDURAL HISTORY**

### A.    PLAINTIFF'S COMPLAINT

Plaintiff filed this action on July 2, 2008.  In his FAC, filed on March 19, 2009, Plaintiff contests the validity of the Notice of Deficiency and alleges the following errors: (1) it is error for Defendant to disallow a capital loss of $142,002,000 for the tax year 2000; (2) it is error for

---

[2] Taxpayer, who was suffering from cancer, died on December 4, 2001.  Plf.'s Mtn. at 6.

1  Defendant not to allow Taxpayer to carry back net operating ordinary losses from 2001 in the

2  amount of $8,757,573, and to carry forward such remaining losses to each succeeding year

3  until such tax benefit has been exhausted; (3) it is error for Defendant to disallow Taxpayer's

4  claimed deductions with respect to his sale of stock in Xing Mail, Swing Solutions, and "Auto

5  Parts, Etc." for the tax year 2000; (4) it is error for Defendant to disallow itemized deductions

6  in the amount of $1,986,639 for the tax years 2000 and 2001; (5) it is error for Defendant to

7  disallow the deduction for the tax year 2001 for a State Income Tax Refund of $143,773; (6) it

8  is error for Defendant not to apply the Alternative Minimum Tax of $78,993 for the tax year

9  2000; (7) it is error for Defendant not to allow Taxpayer to carry over from 2000 to 2001 a

10  capital loss carry over in the amount of $11,070,513; and (8) it is error for Defendant to impose

11  the $5,246,367 accuracy-related penalty.

12  By way of relief, Plaintiff seeks, inter alia: (a) an order declaring the Notice of

13  Deficiency void and requiring Defendant to rescind the Notice; (b) a refund of $26,231,835 for

14  the 2000 tax year; (c) a refund of $5,246,367, which represents the accuracy-related penalty

15  imposed; (d) a refund of $13,624 for the 1998 tax year; (e) a refund of $60,596 for the 1999 tax

16  year; and (f) a refund of $166,198 for the 2001 tax year.  For items (d) – (f), the FAC does not

17  indicate the bases for these refund figures.

18  **B.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

19  Defendant moves for summary judgment on the entirety of Plaintiff's action.

20  Specifically, with respect to error (1) identified in the FAC (the capital loss issue), Defendant

21  moves for summary judgment on the following grounds: (a) Plaintiff's loss claim should be

22  disallowed under 26 U.S.C. ("I.R.C.") § 165(c)(2) of the Tax Code because the undisputed

23  facts show that Plaintiff's primary motive in entering into the Transaction was to avoid taxes;

24  or, (b) alternatively, if the loss is found allowable, it should be limited to $5.8 million.

25  With respect to error (2), Defendant argues that Plaintiff's refund claim based on net

26  operating loss carrybacks from the 2001 tax year is time barred.

27

28

1        With respect to error (3), Defendant asserts that Plaintiff's claimed long-term capital

2   losses from 2000 resulting from Taxpayer's sale of stock in Xing Mail, Swing Solutions, and

3   Auto Parts, Etc. is moot, as Defendant never disallowed these deductions.

4        As for errors (4)-(7), Defendant asserts that "[i]t is undisputed that these issues are pure

5   computational adjustments and the resolution of them thus depends on whether Plaintiff can

6   establish that the taxpayer is entitled to deduct his $142 million loss."  Def.'s Mtn. at 9 n.7.

7   Lastly, with respect to error (8), the accuracy-related penalty, Defendant argues that this claim

8   should be disallowed because Defendant properly credited this amount against Plaintiff's

9   liability for statutory interest on the tax.

10       **C.**     **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

11       Plaintiff moves for partial summary judgment on errors (1) (the capital loss issue) and

12  (8) (the accuracy-related penalty), described above.

13       Regarding error (1), Plaintiff asserts that the undisputed facts establish that the

14  Transaction had profit potential, and therefore Taxpayer's loss can be recognized under §

15  165(c)(2).  Plaintiff also argues that, should the Court find that the loss can be recognized

16  under § 165(c)(2), the Court should not find the Transaction to be a "sham" and set aside the

17  loss, because the undisputed facts show that the Transaction had a business purpose and the

18  requisite economic substance.  Finally, as to error (8), Plaintiff asserts that he is entitled to

19  summary judgment on the accuracy-related penalty issue because Defendant "conceded" that it

20  was not entitled to that penalty.

21       After the close of briefing, the Court ordered the parties to file supplemental briefs with

22  respect to their positions regarding errors (4)-(8) because their initial briefing on these issues

23  was unclear.  Dkt. 138.  The parties have submitted their supplemental briefs, and the parties'

24  motions are now ripe for adjudication.

25  **III.    LEGAL STANDARDS**

26       **A.**     **STANDARD OF REVIEW**

27       Plaintiff brings this action under 28 U.S.C. § 1346(a)(1), which provides:

28

The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of … [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws ….

In an action brought pursuant to § 1346(a)(1) for a refund of taxes already paid to the government, the district court is required to redetermine the entire tax liability.  Lewis v. Reynolds, 284 U.S. 281, 283 (1932).  "In general, courts will not look behind an assessment to evaluate the procedure and evidence used in making the assessment."  Ruth v. U.S., 823 F.2d 1091, 1094 (7th Cir. 1987).  "Rather, courts conduct a de novo review of the correctness of the assessment …."  Id.  A notice of tax deficiency carries a presumption of correctness, requiring the taxpayer to demonstrate that the deficiency is incorrect.  Lesser v. United States, 368 F.2d 306, 310 (2d Cir. 1966) (en banc); United States v. Lease, 346 F.2d 696, 700 (2d Cir. 1965).

**B.    SUMMARY JUDGMENT**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"  Ricci v. DeStefano, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248.

1  Factual disputes are genuine if they "properly can be resolved in favor of either party." Id. at

2  250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from

3  which a reasonable jury, viewing the evidence in the light most favorable to that party, could

4  resolve the material issue in his or her favor. Id.  "If the evidence is merely colorable, or is not

5  significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations

6  omitted).

7  **IV.   DISCUSSION**

8      **A.   ERROR (1): SHORT-TERM CAPITAL LOSS OF $142 MILLION**

9          **1.   I.R.C. § 165(c)(2)**

10      As discussed above, Plaintiff asserts that Taxpayer incurred a short-term capital loss of

11  $142 million for the tax year 2000 arising from the Transaction, and that it is error for

12  Defendant to disallow this capital loss.  Both parties move for summary judgment on this issue.

13      Because Taxpayer is an individual, the question presented is whether his primary

14  motive in entering into the Transaction was to earn a profit.  If the answer is no, then he is not

15  allowed to deduct his alleged short-term capital loss under the Internal Revenue Code.

16  Specifically, taxpayers are allowed as a deduction any losses sustained during a tax year if they

17  are not covered by insurance or other sources. See I.R.C. § 165(a).  If the taxpayer is an

18  individual, the deduction provided for in § 165(a) is limited, as relevant here, to "losses

19  incurred in any transaction entered into for profit, though not connected with a trade or

20  business."  I.R.C. § 165(c)(2) (emphasis added).  "[S]ection 165(c)(2) requires a primary profit

21  motive if a loss from a particular transaction is to be deductible." Fox v. Comm'r of Internal

22  Revenue, 82 T.C. 1001, 1021 (1984).  In other words, the burden of proof is on the taxpayer

23  "to show that he entered into the[] transaction[] primarily for profit." Id.; see also Landreth v.

24  C.I.R., 859 F.2d 643, 645 (9th Cir. 1988) (recognizing that "section 165(c)(2) … has long been

25  construed as imposing a subjective standard requiring that the taxpayer's motive in entering the

26  transaction be 'primarily for profit'" ) (citing Helvering v. National Grocery Co., 304 U.S. 282,

27  289 n. 5 (1938)).  As further explained by the Fox court:

28

By "primary", we mean "of first importance" or "principally" … Profit motive refers to the desire for economic profit, independent of tax savings. … Evaluating [a plaintiff's] motives is, of course, a factual inquiry. The language of section 165(c)(2) speaks of the taxpayer's motive in "entering" a particular transaction and thus our main focus must be on the time petitioner initiated his transactions. Nevertheless, all the circumstances surrounding petitioner's transactions, including the disposition of the [assets], are material to the question of petitioner's intent.

Id. at 1022 (citing Malat v. Riddell, 383 U.S. 569, 572 (1966); Surloff v. Comm'r, 81 T.C. 210, 233 (1983); Knetsch v. U.S., 348 F.2d 932, 937 (Ct. Cl. 1965); Evans v. Rothensies, 114 F.2d 958, 962 (3d Cir. 1940)). Finally, "[g]reater weight is accorded objective facts than is given to petitioner's self-serving statements characterizing his intent." Id. (citing Siegel v. Comm'r, 78 T.C. 659, 699 (1982)).

## 2. Analysis

Here, Defendant argues that the undisputed facts show that Taxpayer's primary motive in entering into the Transaction was to obtain a tax benefit, and not to earn a profit. At the outset, Defendant notes that because Taxpayer is deceased, the parties have no direct testimony from Taxpayer explaining his primary motive for entering into the Transaction. Nevertheless, Defendant deposed individuals who served as Taxpayer's financial advisors at the time he entered into the Transaction and/or individuals with whom Taxpayer discussed the Transaction. These individuals include: (1) Steve Smith, Taxpayer's accountant who prepared Taxpayer's federal income tax returns at issue in this case and facilitated Taxpayer in finding and engaging in the Transaction; (2) Robert Gallo, Taxpayer's investment advisor at Merrill Lynch beginning in late 1998 or early 1999 until Taxpayer died; and (3) John Larson, the individual at Presidio with whom Taxpayer and Smith worked regarding the Transaction.

With respect to Smith, he testified that because of Taxpayer's $132 million gain from the sale of his Commerce One stock in 2000, Taxpayer "was interested in looking at [the PICO product] to see about helping out his tax position." Hendon Decl. Ex. 15 at 39:9-16. Specifically, Smith testified that Taxpayer first engaged in a PICO tax shelter in order to defer gain but, because Taxpayer did not like the restrictions involved in the PICO tax shelter and a better opportunity came along, Taxpayer shortly thereafter exited the PICO tax shelter in order

1   to engage in the Transaction.  Id. 47:19-49:4.  Smith further testified that, although he and

2   Taxpayer believed the Transaction had an opportunity to "generate a significant amount of

3   profit," Taxpayer did not enter into the Transaction looking at it from a profit perspective but

4   instead "went there looking because we wanted to generate a loss."  Id. at 49:2-9.  Smith also

5   testified that Taxpayer knew before engaging in the Transaction that it involved a loss, and

6   even knew the amount of loss that he could expect, because Larson, who promoted and sold the

7   Transaction, asked how much gain Taxpayer had from his stock sale, and then stated that the

8   Transaction "could be structured in such as fashion so as to yield that sort of loss."  Id. at 48:2-

9   13.

10       During the year 2000, Taxpayer relied almost exclusively on Gallo of Merrill Lynch as

11   his financial advisor.  Id. at 34:24-35:14.  Gallo testified that Taxpayer asked him for advice

12   regarding the Transaction.  Id. Ex. 17 (Gallo Dep. Tr.) at 28:21-29:7.  Gallo testified that while

13   he was not provided any details of the Transaction, he advised Taxpayer "not to do it" and to

14   instead pay the capital gains tax because capital gain rates were so low at that time.  Id. at 29:2-

15   15.  Moreover, when asked whether Taxpayer was focused on the tax aspects of the

16   transaction, Gallo testified: "I'm sure he was focused on the amount of tax that he owed"; "I'm

17   sure tax was the primary motivation."  Id. at 30:16-31:25.

18       Finally, Smith testified that Larson was the only person with whom he spoke in

19   substance regarding the Transaction.  Id. Ex. 15 at 49:23-25.  When deposed by Defendant,

20   Larson asserted his Fifth Amendment rights against self-incrimination as to all questions

21   regarding the Transaction and Taxpayer.  See id. Ex. 18 (Larson Dep. Tr.).

22       In response, Plaintiff does not dispute that § 165(c)(2) applies to the question of whether

23   the losses Taxpayer incurred from the Transaction are deductible.  Rather, Plaintiff disputes

24   whether § 165(c)(2) requires that Taxpayer entered into the Transaction "primarily for profit,"

25   as the above-stated authorities make clear.  According to Plaintiff, it is sufficient to show that

26   Taxpayer "had a profit motive" in entering into the Transaction, and that the Taxpayer believed

27   the Transaction had "profit potential."  Plf.'s Opp. at 13-14 (emphasis added).  Applying that

28   standard, Plaintiff offers the testimony of Smith, who stated that while he understood that the

1   Transaction "would provide a tax loss for [Taxpayer] in 2000," he also understood that the

2   Transaction "had an opportunity for significant profit as well."  Dkt. 91, Schainbaum Decl. Ex.

3   2 (Smith Dep. Tr.) at 47:22-48:9.  Plaintiff also offers the testimony of Bruce Lemons,

4   Taxpayer's tax attorney, who prepared a Tax Opinion Letter, dated March 1, 2001, regarding

5   the Transaction that Taxpayer and Smith could rely upon in the preparation of Taxpayer's 2000

6   Federal Income Tax Return.  See Dkt. 92-2, Lemons Decl. ¶ 4.  Lemons testified that after

7   reviewing the Transaction, he believed it had "real opportunity to earn a significant profit …."

8   Id. ¶ 11.  Plaintiff also offers the following exchange from Lemon's deposition in support of

9   his assertion that Lemons knew that Taxpayer entered into the Transaction with a subjective

10  intent to make a profit:

11          Q.      You never asked him person to person, face to face, whether he had a
12          subjective intent to earn a profit.

13          A.      I got my representation in a different way.  I sent the two-page [opinion]
            letter to Mr. Smith, his representative, saying, look, you got to read the facts and
14          let me know if you're uncomfortable with the facts that were recited in the
            opinion letter.  I took silence as acceptance.

15
16          Q.      And you never followed up to make sure that this silence meant
            acceptance – is that correct – i.e., you didn't call [Taxpayer]?

17          A.      No.

18          Q.      Or Mr. Smith?

19          A.      No.

20  Schainbaum Decl. Ex. 5 (Lemons Dep. Tr.) at 218:7-21.

21          As a preliminary matter, the Court rejects Plaintiff's assertion that it is sufficient under

22  § 165(c)(2) that Taxpayer had simply some profit motive when he entered into the Transaction,

23  as Plaintiff has misstated the law.  As explained above, the Ninth Circuit has made clear that

24  "section 165(c)(2) … has long been construed as imposing a subjective standard requiring that

25  the taxpayer's motive in entering the transaction be 'primarily for profit ….'"  Landreth, 859

26  F.2d at 645.  Thus, in order to deduct any loss resulting from the Transaction, Plaintiff must

27  establish that Taxpayer's primary motive for entering into the Transaction was to earn a profit.

28

1    Instead of relying on authorities interpreting § 165(c)(2), Plaintiff attempts to confuse

2    the issue by relying on inapposite cases that generally consider whether a transaction is a

3    "sham," such that any losses generated by the transaction cannot be honored for tax purposes.

4    See e.g., U.S. v. Consumer Life Ins. Co., 430 U.S. 725, 736-739 (1977) (in considering, under

5    I.R.C. § 801, how unearned premium reserves for accident and health insurance policies should

6    be allocated between a primary insurer and a reinsurer for federal tax purposes, finding

7    reinsurance treaties were not sham transactions because they served a valid business purpose).

8    Indeed, in his own motion for summary judgment, Plaintiff argues that summary judgment in

9    his favor is appropriate on the deductibility issue because the undisputed facts show that the

10   Transaction was not a sham transaction.  However, § 165(c)(2)'s "for profit" requirement is a

11   separate inquiry from whether a transaction can generally be considered a "sham," and,

12   therefore, Plaintiff's arguments directed to the "sham" inquiry are not dispositive.

13       Specifically, the Ninth Circuit has set forth a two-part test for determining whether a

14   transaction is a sham: "1) has the taxpayer shown that it had a business purpose for engaging in

15   the transaction other than tax avoidance? 2) has the taxpayer shown that the transaction had

16   economic substance beyond the creation of tax benefits?"  Casebeer v. C.I.R., 909 F.2d 1360,

17   1363 (9th Cir. 1990).  Plaintiff inappropriately equates § 165(c)(2)'s requirement that the

18   Transaction be entered into "primarily for profit" with the question under a "sham" analysis of

19   whether the taxpayer has shown a business purpose for entering into the transaction other than

20   tax avoidance.  While "[t]he business purpose prong of the sham transaction inquiry is similar

21   to the 'primarily for profit' standard of 26 U.S.C. § 165, …[u]nlike the 26 U.S.C. § 165

22   inquiry, however, the business purpose inquiry is met by the taxpayer if he can show any

23   business purpose for structuring his transactions other than tax avoidance."  Sala v. U.S., 552

24   F.Supp.2d 1167, 1186 (D. Colo. 2008) (citing Friedman v. C.I.R., 869 F.2d 785, 792 (4th Cir.

25   1989)).  At bottom, Plaintiff has failed to offer any authority to support his argument that so

26   long as Taxpayer had any motivation other than tax avoidance for entering into the

27   Transaction, § 165(c)(2) poses no bar to his deduction of losses generated by the Transaction.

28

Because Plaintiff has relied upon the wrong legal standard, Plaintiff has offered no evidence to establish that Taxpayer entered into the transaction primarily for profit.  Instead, Plaintiff simply offers evidence that he claims shows that Taxpayer had some profit or business motive in entering into the Transaction.  By contrast, Defendant's proffered evidence demonstrates that Taxpayer's primary motive for entering into the Transaction was to escape income tax, not to make a profit, and Plaintiff has not come forward with evidence to show otherwise.  Therefore, the Court GRANTS Defendant's motion for summary judgment as to error (1).  For these same reasons, the Court DENIES Plaintiff's motion for summary judgment on this issue.[3]

## B.   ERROR (2):  NET OPERATING LOSS CARRYBACKS

Plaintiff alleges in his FAC that Taxpayer is entitled to a refund of taxes Taxpayer paid for his 1996-2000 tax years because Taxpayer is entitled to carry back his net operating loss arising in tax year 2001 (in the amount of $8,609,628) and apply it as a deduction first to tax year 1996, to offset the taxpayer's 1996 taxable income, and then carry forward that loss as an offset to each succeeding tax year until the loss is exhausted.  See FAC ¶¶ 60-67.  This claim does not relate to the Transaction.  Defendant moves for summary judgment on this claim on the ground that it is time barred.

### 1.   Legal Standard

Congress has provided taxpayers with a cause of action to recover internal revenue taxes alleged to have been erroneously or illegally assessed or collected.  See I.R.C. § 7422(a). Section 7422(a) further provides that no suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed until a claim for refund or credit has been duly filed with the Secretary of the Treasury.  Id. "No credit or refund shall be allowed or made after the expiration of the period of limitation prescribed in subsection (a) for the filing of a claim for credit or refund, unless a claim for

---

[3] Because Plaintiff has failed to show that Taxpayer is entitled to deduct the short-term capital loss related to the Transaction under § 165(c)(2), it is not necessary for the Court to reach the issue of whether Taxpayer's short-term capital loss arising from the Transaction was $142 million or $5.8 million.

credit or refund is filed by the taxpayer within such period."  I.R.C. § 6511(b)(1).  "A timely claim is a jurisdictional prerequisite to an action for recovery of taxes paid."  <u>Miller v. United States</u>, 38 F.3d 473, 474 (9th Cir. 1994) (citations omitted).

Suits seeking a refund of an overpayment of any tax are governed by the time periods set forth in I.R.C. § 6511(a) which provides:

> Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid.

However, if the claim for refund is based on a net operating loss carryback (as is the case here with error (2)), I.R.C. § 6511(d)(2) applies and provides:

> [I]n lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be that period which ends <u>3 years after the time prescribed by law for filing the return (including extensions thereof) for the taxable year of the net operating loss . . . which results in such carryback</u>, or the period prescribed in subsection (c) in respect of such taxable year, whichever expires later. (Emphasis added.)

In addition, the time periods in §§ 6511(a) and (d)(2) to submit a claim for refund are further modified if a taxpayer and the IRS enter into an agreement under I.R.C. § 6501(c)(4) to extend the statute of limitations for the IRS to assess a tax liability against the taxpayer:

> The period for filing claim for credit or refund or for making credit or refund if no claim is filed, provided in subsections (a) and (b)(1), shall not expire prior to 6 months after the expiration of the period within which an assessment may be made pursuant to the agreement or any extension therefor under section 6501(c)(4).

I.R.C. § 6511(c)(1).

Thus, if during the time period that a taxpayer could file a refund claim, he enters into an agreement with the IRS to extend the deadline for the IRS to assess a tax liability against him, the deadline for the taxpayer to file his refund claim is extended to six months after the agreed-upon deadline for the IRS to assess the liability.

### 2.    Analysis

Here, it is undisputed that Taxpayer's refund claims regarding his 1996-2000 tax years are based on a net operating loss carryback from his 2001 tax year.  <u>See</u> FAC ¶¶ 60-67.  Thus,

- 15 -

the time period set forth in § 6511(d)(2) applies (i.e., "3 years after the time prescribed by law for filing the return (including extensions thereof) for the taxable year of the net operating loss . . . which results in such carryback"). <u>See</u> I.R.C. § 6511(d)(2). Furthermore, it is undisputed that Taxpayer and Defendant entered into an agreement to extend deadline for Defendant to assess Taxpayer's 2001 income tax liability to December 31, 2006. <u>See</u> Hendon Decl. Ex. 3. Thereafter, Taxpayer had an additional six months, or until June 30, 2007, to file a claim for refund. <u>See</u> I.R.C. § 6511(c)(1); Hendon Decl. Ex. 3. Taxpayer did not file his claims for refund until August 17, 2007. <u>See</u> FAC, Exhibit 1, p. 1. As a result, the evidence presented shows that Plaintiff's refund claims were filed forty-eight days late and are thus barred by the statute of limitations.

Plaintiff's arguments to the contrary are wholly without merit. First, Plaintiff asserts that I.R.C. § 6901, "Transferred Assets," extends the statute of limitations for the IRS to make an assessment against Taxpayer by one year. <u>See</u> I.R.C. § 6901(c) ("[t]he period of limitations for assessment of any such liability of a transferee or a fiduciary shall be … [i]n the case of the liability of an initial transferee, within <u>1 year</u> after the expiration of the period of limitation for assessment against the transferor ....") (emphasis added). In support of that argument, Plaintiff contends that when Taxpayer died on December 4, 2001, his assets were transferred to his personal representative, i.e., Plaintiff. Therefore, to follow Plaintiff's logic, the deadline for the IRS to make an assessment was extended to December 31, 2007 (one year after the December 31, 2006 deadline to make the assessment pursuant to the parties' agreement), and, after adding six months to December 31, 2007 under § 6511(c)(1), the deadline for Taxpayer to file his refund claim was June 30, 2008.

At the outset, Plaintiff has offered no statutory or decisional authority to support his contention that § 6901 can be used to extend the deadline for the IRS to make an assessment beyond the parties' express agreement regarding such a deadline. In other words, Plaintiff has failed to establish that the parties' agreement to extend the deadline for assessment to December 31, 2006 can simply be set aside under § 6901.

1    Moreover, Plaintiff has failed to establish that § 6901 is even applicable here.  Section

2  6901's purpose is to provide an alternative method for collection in situations where a taxpayer

3  has transferred assets to a third party, permitting the IRS to make a direct assessment against

4  the transferee and collect from the transferee as though he were the taxpayer.  See I.R.C. §

5  6901(a); Bresson v. Commissioner, 213 F.3d 1173, 1174 (9th Cir. 2000) (§ 6901 "provides that

6  the IRS may assess and collect a transferee's legal and equitable liabilities when those

7  liabilities were incurred in connection with the tax liability of the transferor").  Plaintiff has

8  presented no evidence to show that such a situation is present here, i.e., there is no evidence

9  that Defendant sought to assess Plaintiff as a transferee.  Instead, the presented evidence shows

10  Plaintiff's estate was assessed, and Plaintiff paid the tax assessment as the personal

11  representative for Plaintiff's estate.  Furthermore, Plaintiff has offered no evidence that

12  Taxpayer's assets were, in fact, transferred to him upon Taxpayer's death.  Instead, in his FAC,

13  Plaintiff alleges that Taxpayer's will was submitted for probate on January 29, 2002.  FAC ¶ 2.

14  At bottom, no evidence has been submitted regarding the disposition of Taxpayer's assets.

15    Second, Plaintiff argues that, in the alternative, because a notice of deficiency was

16  issued to Taxpayer under I.R.C. § 6213, the statute of limitations for making an assessment was

17  tolled until May 5, 2007.  See § 6213 ("The running of the period of limitations … on the

18  making of assessments … shall … be suspended for the period during which the Secretary is

19  prohibited from making the assessment or from collecting by levy or a proceeding in court (and

20  in any event, if a proceeding in respect of the deficiency is placed on the docket of the Tax

21  Court, until the decision of the Tax Court becomes final), and for 60 days thereafter.").

22  Although not made clear in his brief, it appears that Plaintiff is asserting that the deadline for

23  filing a refund claim was therefore extended (under § 6511(c)(1)) to six months after May 5,

24  2007, or to November 5, 2007.  Plaintiff's briefing on this issue is wholly deficient, as he fails

25  to indicate where in the record he finds support for this May 5, 2007 date.  Furthermore, as

26  with his argument regarding § 6901, Plaintiff provides no statutory or decisional authority to

27  support his contention that § 6213 can be used to extend the parties' agreed-upon deadline for

28  the IRS to make an assessment.

For the reasons stated, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's refund claim based on net operating loss carrybacks from the 2001 tax year (error (2)).

### C.   ERROR (3): CLAIMED DEDUCTIONS AS TO XING MAIL, SWING SOLUTIONS, AND AUTOPARTS, ETC.

In his FAC, Plaintiff alleges that it is error for Defendant to disallow Taxpayer's claimed deductions with respect to his stock in Xing Mail, Swing Solutions, and "Auto Parts, Etc." for the tax year 2000.  FAC ¶ 53.  Defendant moves for summary judgment on this issue on the ground that Taxpayer claimed loss deductions on his 2001 Form 1040, and not on his 2000 Form 1040, with respect to his stock ownership in these companies.  Compare Hendon Decl. Ex. 2 (Schedules D and D-1) with Ex. 1 (Schedules D and D-1).  Thus, Defendant asserts that Plaintiff's refund claim with respect to Taxpayer's asserted loss deductions for Xing Mail, Swing Solutions, and Auto Parts, Etc. is erroneous.  Defendant further explains that, in any event, it did not disallow Taxpayer's 2001 loss deductions for these companies and Plaintiff has no evidence to the contrary.

In response, Plaintiff represents that, based on Defendant's assertion that these claims were not disallowed, "the allowance of these loss deductions is therefore no longer in controversy in this case."  Plf.'s Opp. at 18.  Therefore, Defendant's motion for summary judgment on the issue of Plaintiff's claimed deductions for Xing Mail, Swing Solutions, and Auto Parts, Etc. (error (3)) is GRANTED.

### D.   ERROR (4): ITEMIZED DEDUCTIONS FOR 2000 AND 2001

Plaintiff asserts that it is error for Defendant to disallow itemized deductions for the tax years 2000 and 2001.  With respect to tax year 2000, the parties stipulate that Taxpayer's claimed itemized deductions for that year depend on the resolution of Plaintiff's claim of a $142 million capital loss arising from the Transaction.  See Dkt. 169.  As indicated, the Court has determined that, under the evidence presented, Taxpayer is not entitled to deduct capital losses related to the Transaction under § 165(c)(2).

1    As for tax year 2001, the parties agree that this claim is unrelated to the capital loss

2    issue.  Id.  Defendant moves for summary judgment on this claim on the ground that it is time

3    barred.  Specifically, Defendant asserts that whether these deductions are allowable (as part of

4    Plaintiff's claimed net operating loss for 2001) depends on whether Plaintiff filed his refund

5    claims within the applicable statute of limitations for carrying back a 2001 net operating loss to

6    1996-2000.  In other words, if the Court finds that Plaintiff's carryback claim – error (2) – is

7    time barred, Plaintiff's claim for deductions for 2001 is also time barred.  On this issue, the

8    parties have presented the same arguments and authorities in support of their respective

9    positions.  As explained above with respect to error (2), Plaintiff's refund claims were filed late

10   and are thus barred by the statute of limitations.

11   For these reasons, Defendant's motion for summary judgment as to Plaintiff's claim for

12   itemized deductions for 2000 and 2001 (error (4)) is GRANTED.

13      **E.      ERRORS (5)-(7)**

14   The parties stipulate that if the Court determines that Taxpayer's claimed $142 million

15   capital loss is not allowable, errors (5), (6), and (7) identified in Plaintiff's FAC would no

16   longer be in controversy.  See Dkt. 169.  As the Court has determined, based on the evidence

17   presented, that Taxpayer is not entitled to deduct capital losses related to the Transaction under

18   § 165(c)(2), summary judgment is GRANTED in Defendant's favor as to errors (5), (6), and

19   (7).

20      **F.      ERROR (8):  ACCURACY-RELATED PENALTY**

21   Both parties move for summary judgment on Plaintiff's claim that it is error for

22   Defendant to impose the $5,246,367 accuracy-related penalty.  Defendant argues that whether

23   Plaintiff is entitled to a refund of this penalty depends on whether he is entitled to a refund of

24   the tax attributable to Defendant's disallowance of the $142 million capital loss.  In other

25   words, according to Defendant, if Plaintiff is not liable for the tax, then he would receive a

26   refund of the penalty along with the tax.  If Plaintiff is liable for the tax, he is not entitled to a

27   refund of the penalty because Defendant credited it under I.R.C. § 6402(a) against Plaintiff's

28   much larger tax liability for statutory interest on the tax, which Defendant asserts Plaintiff has

1    not paid.  <u>See</u> Dkt. 170, Norris Decl. ¶ 4.[4]  It should be noted that Defendant does not dispute

2    that Plaintiff should be credited for the penalty.

3         In response, Plaintiff argues that a credit under § 6402(a) cannot be invoked at this time

4    because Taxpayer's tax liability has not yet been determined, as there are disputed questions of

5    fact regarding whether his claimed $142 million capital loss should be allowed.  <u>See</u> Dkt. 171.

6    According to Plaintiff, he should be refunded the penalty now, and Defendant cannot apply it

7    as a credit to Taxpayer's tax liability.  Inexplicably, this argument is directly contrary to

8    Plaintiff's motion for summary judgment on the capital loss issue, in which he asserts there are

9    no such fact questions.  In any event, as the Court has determined that, based on the proffered

10    evidence, Taxpayer is not entitled to deduct capital losses related to the Transaction, summary

11    judgment is GRANTED in Defendant's favor as to error (8).  For these same reasons, the Court

12    DENIES Plaintiff's motion for summary judgment on this issue.

13   **V.**     <u>**CONCLUSION**</u>

14         For the reasons stated above,

15         IT IS HEREBY ORDERED THAT:

16         1.     Defendant's Motion for Summary Judgment (Dkt. 90) is GRANTED.

17         2.     Plaintiff's Motion for Partial Summary Judgment (Dkt. 92) is DENIED.

18         3.     This Order terminates Dockets 90 and 92.

19         IT IS SO ORDERED.

20   Dated: 3/4/11               _____

21                      SAUNDRA BROWN ARMSTRONG

                         United States District Judge

22

23

24

25

---

26        [4] Section 6402(a) provides: "In the case of any overpayment, the Secretary, within the

27 applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of

28 the person who made the overpayment and shall, subject to subsections (c), (d), (e), and (f), refund any balance to such person."